NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JOANNA LYNN MASCI and JOSEPH MASCI, | : | |
| | : | |
| Plaintiffs, | : | Civil Action No. 12-6585 |
| | : | |
| v. | : | **OPINION** |
| | : | |
| SIX FLAGS THEME PARK, INC., | : | |
| | : | |
| Defendant. | : | |

PISANO, District Judge

In 2012, Plaintiff Joseph Masci ("Joseph"), then a fourteen-year-old boy, attempted to ride a certain ride at Six Flags Great Adventure only to learn that he no longer fit the ridership requirements for the ride. Not only that, but Joseph was no longer permitted on all but two rides at the park due to new ridership requirements at Six Flags that exclude, from the vast majority of rides, riders without at least one fully formed arm and one fully formed leg. Six Flags found that Joseph did not meet these requirements, and accordingly refused to let him ride nearly all the rides at the park.

Plaintiffs Joseph Masci and his mother Joanna Lynn Masci have now brought this lawsuit, alleging that Defendant Six Flags Theme Park, Inc. ("Defendant" or "Six Flags") violated the Americans with Disabilities Act ("ADA") and the New Jersey Law Against Discrimination ("NJLAD") by failing to let Joseph ride the majority of the rides at the park – including those which he has ridden in the past – on the basis of his disability. Currently pending before the Court are two motions for summary judgment brought by Plaintiffs and Defendant. Defendant argues that New Jersey law requires them to follow and implement ridership restrictions mandated by its ride manufacturers; therefore, it did not exclude Joseph

from riding its rides because of any discriminatory purpose but because it was following New Jersey law. Consequently, it argues that it did not violate the ADA or NJLAD. Alternatively, Defendant argues that its ridership requirements were necessary for the safe operation of the rides and therefore did not violate the ADA or NJLAD. Plaintiffs have also moved for summary judgment, and have cross-moved to exclude certain evidence and testimony from Defendant's motion. The Court decides these motions without oral argument pursuant to Fed. R. Civ. P. 78. For the reasons set forth below, the Court denies these motions.

## I.     Background

Six Flags Great Adventure ("Great Adventure"), located in Jackson, New Jersey, is one of the many parks ran by Six Flags Theme Parks, Inc. ("Six Flags"), the world's largest regional theme park company. *See Investor Relations: Overview*, Six Flags, http://investors.sixflags.com/phoenix.zhtml?c=61629&p=irol-irhome (last visited December 23, 2014). While Great Adventure advertises a series of entertainment, dining, and shopping options, the heart of the park is clearly the many rides that it offers to a visitor: "the most thrilling rides on the planet." *See Entertainment*, Six Flags Great Adventure, https://www.sixflags.com/greatadventure/attractions/live-entertainment (last visited December 23, 2014). As the operator of an amusement park that is available for use to by the general public in New Jersey, Six Flags are subject to New Jersey Administrative Code Section 5:14A, the Carnival-Amusement Rides Code (the "Code"), the purpose of which is "to provide reasonable standards for the design, construction, and operation of amusement rides for the safety of the public." N.J. Admin. Code § 5:14A:1-1(b). The regulations mandate that all amusement parks must be operated in compliance with the Code. One of the provisions of the

Code requires the owner of an amusement park to "operate the ride in accordance with the manufacturer's operating manual." *Id.* § 5:14A:9.8(a).

Recently, Six Flags made changes to the ridership requirements for certain rides at its various parks, including Great Adventure. This move arose out of an accident that occurred at another amusement park. Specifically, on July 8, 2011, a passenger who was missing both legs fell out of a rollercoaster and died when he was lifted out of his seat and the safety restraints at Darien Lake amusement park outside of Buffalo, New York. It is believed that a factor in this fatal accident was that this passenger was missing both his legs, making him unable to be safely restrained during the ride. *See* Declaration of Leonard Turtora ("Turtora Decl.") ¶ 6; Declaration of Patrick Hoffman ("Hoffman Decl.") ¶ 5.

As a result of this accident, Six Flags parks throughout the United States, including Great Adventure, started to receive service bulletins from the manufacturers of certain rides, including Bolliger & Mabillard Consulting Engineers, Inc. ("Bolliger & Mabillard"). *See id.*; *see also* Declaration of Lawrence Chickola ("Chickola Decl.") ¶ 7. Among the information included in these service bulletins is the manufacturer's determination of what ridership restrictions are warranted to make the rides safe for all customers. *See* Turtora Decl. ¶¶ 7–8. In these service bulletins, Bolliger & Mabillard changed the ridership requirements for a number of rides, including the following rides at Great Adventure: (1) the "Nitro" rollercoaster; (2) the "Superman Ultimate Flight" rollercoaster; (3) the "Bizarro" rollercoaster; (4) the "Batman the Ride" rollercoaster; and (4) the "Green Lantern" rollercoaster. Bolliger & Mabillard changed the ridership restrictions in these rides to restrict, among other things: (1) "a rider with one amputated foot or two amputated feet (amputation above the ankle) may ride, provided such rider has the ability to hold on with two functioning hands"; and (2) "a rider with one missing

arm or hand may ride, provided such rider has the ability to hold on with one functioning hand and brace himself/herself with two functioning legs."  *See id.* at ¶¶ 8–9; Service Bulletins of Bolliger Mabillard, *located at* Turtora Decl. Ex. A.  Upon receiving these service bulletins, Six Flags implemented the ridership requirements contained within the service bulletins.  *See* Hoffman Decl. ¶ 9; Turtora Decl. ¶ 10.

During the same time period, Six Flags also decided to conduct an audit of the ridership requirements on its rides in all parks owned and operated by Six Flags.  *See* Hoffman Decl. ¶ 10; Turtora Decl. ¶ 11; Chickola Decl. ¶ 11.  According Mr. Patrick Hoffman, the Corporate Vice President of Safety, Security, and Risk Management for Six Flags Entertainment Corporation, the purpose of this audit was to "update and enhance" the ridership requirements for rides at Six Flags' parks in order to ensure the safety of riders and customers at Six Flags parks nationwide, consistent with the updates provided by Bolliger & Mabillard.[1]  *See* Hoffman Decl. ¶ 10.  In conducting this audit, Six Flags assembled an executive committee to review the ridership requirements currently in place at the various parks, and to propose any changes.  *Id.* at ¶ 11; Turtora Decl. ¶ 12.  In reviewing the ridership requirements, the committee considered a number of items, including (1) the manufacturer guidelines; (2) manufacturer service bulletins; (3) engineering reports from Six Flags' engineering team; (4) the standards developed by the American Society for Testing and Materials ("ASTM") F24 Committee on Amusement Rides and Devices; and (5) the collective knowledge of the committee members.  *See* Turtora Decl. ¶ 13.  In instances where a ride manufacturer was out of business or had not issued recent

---

[1] Plaintiffs dispute this fact, alleging that "the purpose [of the audit] was to preclude certain disabled persons from the rides.  It is further denied that the changes to policy were 'consistent' with the service bulletins.  The changes went even beyond the bullets."  Pls.' Resp. to Def.'s Statement of Material Facts ("Def.'s SOMF") at ¶ 10.  Like the entirety of its Response to Def.'s SOMF, Plaintiffs, however, fails to "cit[e] to the affidavits and other documents submitted in connection with the motion," in contravention of Local Rule 56.1.  The Court cannot credit such unsupported statements.

guidance, Six Flags looked to manufacturer requirements for similar rides in any amusement park and/or to industry standards to determine what enhanced ridership requirements were warranted, if any.  *Id.* at ¶ 14; Hoffman Decl. ¶ 12.  Six Flags also consulted with its engineering team to determine if the ridership requirements being proposed by the executive committee were appropriate from an engineering prospective.  *See* Chickola Decl. ¶ 12.

Upon completion of its audit, the executive committee changed its ridership requirements for all but a few of the "flat/non-rotating" Six Flags rides as follows:  (1) for rides where the manufacturer had issued recent service bulletins, the restrictions imposed by the ride manufacturer will be imposed; and (2) for rides where the manufacturer is no longer in business or has otherwise not issued current guidelines, in order to ride these rides guests must possess at least one fully formed and functioning leg absent a prosthetic device and least one fully formed and functioning arm absent a prosthetic device.  *See* Turtora Decl. ¶ 15; Hoffman Decl. ¶ 13. According to Great Adventure's Safety & Accessibility Guide, a "functioning limb is a limb over which a person has control.  A prosthetic device is not considered a functioning extremity."  *See* Six Flags Great Adventure Safety & Accessibility Guide at 6, *located at* Hoffman Decl. Ex. B (the "Safety Guide").  A functioning leg "is a leg with a foot," while a functioning arm "is a full arm with the ability to be flexed at the elbow and a minimum of three full fingers with the ability to hold on with a firm grip."  *Id.*  The ability to hold on or brace is defined as the "ability to use one's arms to maintain a grasp on an assist bar and support one's body during normal and emergency procedures on a ride and to use one's legs to brace to maintain a seated position during the ride."  *Id.*

The Six Flags engineering team was also tasked with conducting an analysis regarding prosthetic limbs and the potential that such limbs could become projectiles if such prosthetics

were allowed on certain Six Flags rides.  *See* Chickola Decl. ¶ 13.  In conducting this analysis, the engineering team prepared a number of maps detailing the potential projectile path a prosthetic limb could take if it were to become loose while a passenger was riding certain rides at Great Adventure.  *Id.*; *Id.* at Ex. B.  While Six Flags has always maintained a policy barring the use of prosthetics on rides with certain dynamic ride and centrifugal forces, the executive committee changed the ridership requirements to further restrict the use of prosthetic devices on its rides due to the risk of a prosthetic device falling off during a ride upon completion of this analysis.  *See id.* at ¶ 14; Hoffman Decl. ¶ 14.

Mr. Hoffman asserts that the main purpose of these new ridership requirements was to increase the safety of the people riding Six Flags' rides and the safety of other guests at Six Flags' parks.  He states that a secondary purpose of the new ridership requirements was to ensure that all parks have consistent policies and procedures in place which can be easily implemented by Six Flags' ride operators.  Hoffman Decl. ¶ 15.  Once the new ridership restrictions were issued by the executive committee, Six Flags began implementing the new ridership guidelines at the Park.  *See id.* at ¶ 15; Turtora Decl. ¶ 16.  Six Flags trained the staff and ride operators concerning these new guidelines, amended the signage at Great Adventure to reflect these new guidelines, and revised the Safety Guide to reflect these new guidelines.  *See* Turtora Decl. ¶ 17, Exs. B–D.  Hoffman Decl. ¶ 17.

On April 13, 2012, after Six Flags implemented the new ridership requirements, Plaintiff Joseph Masci visited Great Adventure.  *See* Turtora Decl. ¶ 21, Ex. E.  Joseph was born with a number of physical disabilities.  *See* Prosthetic and Orthotic Team Reevaluation, dated Nov. 14, 2011, *located at* Declaration of Sean J. Kirby Ex. A (the "Medical Report").  While the parties dispute the extent of Joseph's disabilities, a review of Joseph's medical record submitted by

6

Defendant Six Flags indicates that he has two full legs but is missing the upper sections of both feet.  Joseph wears lower limb prostheses, but can ambulate independently indoors and outdoors and can do some modest running and jumping activities.  Joseph is missing his right arm above the elbow, and has a shortened left forearm with four digits and a thumb.  He has some pinch ability with his left hand when he brings the fingers against his forearm for pinching or hooking objects, but has relatively little mobility with his thumb.[2]  He utilizes a right arm prosthetic device.  *See* Medical Report at 1–2.

When Joseph visited Great Adventure on April 13, 2012, he attempted to ride a number of rides.  *See* Turtora Decl. ¶ 22, Ex. E.  He was, however, informed that he was no longer able to ride certain rides because he did not possess a fully formed and functioning arm extremity absent a prosthetic device and one fully formed and functioning leg absent a prosthetic device and therefore did not qualify for most of the rides in Great Adventure under the new ridership requirements.  *Id.*

On August 29, 2012, Plaintiffs filed this lawsuit, asserting that Six Flags' new ridership requirements violated the American with Disabilities Act ("ADA") and the New Jersey Law Against Discrimination ("NJLAD").  Defendant removed the matter to this Court on October 17, 2013 from the Superior Court of New Jersey, Ocean County.   Defendant has now moved for summary judgment, arguing that judgment should be entered in its favor for two independent reasons: (1) Six Flags is required by the Code to follow the ridership restrictions implemented by its ride manufacturers, *see* N.J. Admin. Code § 5:14A-9.8(a), and therefore its implementation of "enhanced" ridership requirements did not violate the ADA or NJLAD; and (2) Six Flags' ridership requirements are necessary for the safe operation of its rides, and therefore its new

---

[2] In their brief, Plaintiffs make certain assertions about the extent of Joseph's disability.   Plaintiffs, however, provide no support for these assertions, and the Court cannot simply assume that these assertions are true.

ridership requirements do not violate the ADA or NJLAD.  Plaintiffs have moved for summary judgment as well, essentially arguing that Defendant has failed to provide any evidence to establish any defenses to the ADA or NJLAD claims.  Plaintiffs have also moved to exclude certain evidence submitted by Defendant.  The Court addresses these arguments below.

## II.    Motion to Exclude Evidence

Before moving to the summary judgment motions, the Court first addresses Plaintiffs' cross-motion to exclude certain evidence submitted by Defendant Six Flags.[3]

### A.    *Testimony and Exhibits of Six Flags' Employees*

Next, Plaintiffs move to exclude the declarations and exhibits submitted by Six Flags of three employees: Lawrence Chickola, Patrick Hoffman, and Leonard Turtora.  Plaintiffs argue that the declarations of these employees should be excluded because these declarations constitute improper expert witness testimony.  The Court disagrees.  The declarations constitute admissible lay witness testimony under Fed. R. Evid. 701.  Each declarant explains factual details about their involvement in Six Flags' audit of its ridership requirements.  Mr. Turtora, for example, was a member of the executive committee who evaluated the prior ridership requirements at Six Flags and proposed the new ridership requirements.  *See* Turtora Decl. ¶¶ 12–16.  Mr. Chickola was the Chief Engineer for Six Flags who was consulted to determine if the proposed ridership requirements were appropriate from an engineering prospective and who conducted an analysis regarding prosthetic limbs.  Chickola Decl. ¶¶ 1, 4, 12, 13.  Mr. Hoffman, as the Corporate Vice President of Safety, Security and Risk Management at Six Flags, was tasked with implementing

---

[3] As part of its cross-motion, Plaintiffs moved to exclude the testimony and report of Defendant's proffered expert, Mr. John Paul Scott.  They also moved to exclude certain Department of Justice letters submitted by Defendant. The Court did not rely on either the testimony or report of Mr. Scott or the DOJ letters in its consideration of Defendant's Motion for Summary Judgment.  Accordingly, it will deny Plaintiffs' cross-motion to exclude as it pertains to this evidence, albeit without prejudice.  Plaintiffs are free to refile the motion at a relevant time if they so choose.

the new ridership requirements.  Hoffman Decl. ¶¶ 1, 16, 17.  The declarations offer no expert

opinions; merely because a witness could qualify as an expert does not mean that he may not

otherwise offer lay testimony based upon his personal knowledge and perception.  *See Teen-Ed,*

*Inc. v. Kimball International, Inc*., 620 F.2d 399, 403 (3d Cir. 1980).  Indeed, under Third Circuit

law, a lay witness may appropriately offer an opinion as long as such opinion testimony "is

based on sufficient experience or specialized knowledge and a sufficient connection exists

between such knowledge and experience and the lay opinion, that opinion should be admitted

because it may be fairly considered to be rationally based on the perception of the witness and

truly helpful to the jury." *Ghee v. Marten Transp., Ltd.*, 570 F. App'x 228, 231 (3d Cir. 2014)

(quoting *Asplundh Mfg. Div. v. Benton HarborEng'g*, 57 F.3d 1190, 1193 (3d Cir. 1995)

(internal quotations omitted).  Rather, as employees of Six Flags who were involved with the

audit process, the testimony within the declarations is appropriately "based on the witness's own

perceptions and 'knowledge and participation in the day-to-day affairs of [the] business." *United*

*States v. Polishan*, 336 F.3d 234, 242 (3d Cir. 2003) (quoting *Lightning Lube, Inc. v. Witco*

*Corp.*, 4 F.3d 1153, 1175 (3d Cir. 1993)).  Accordingly, considering the "modern trend" of

favoring "the admission of lay opinion testimony," *Lightning Lube*, 4 F.3d at 1175 (alternation

omitted), the Court finds that the statements within the declarations qualify as lay testimony.[4]

    Plaintiffs also assert that the statements contained within the declarations constitute

impermissible hearsay.  Plaintiffs, however, fail to recognize that the declarants are testifying to

their own personal experiences and observations.  As discussed, a review of the declarations

reveal that Chickola, Hoffman, and Turtora were each involved in the safety audit process

conducted by Six Flags and testified to their experiences and observations made in the scope of

---

[4] Plaintiffs have expressed concern about the possibility of these witnesses crossing the line into expert testimony.
Because that issue is not presently before the Court, it need not address it at this time.

their employment with Six Flags.  Such testimony simply is not hearsay.  *See, e.g.*, *Thomas v. Cumberland County*, Civil Action No. 09-1323, 2012 U.S. Dist. LEXIS 124241, at *6-7 (D.N.J. Aug. 30, 2012); *see also* Fed. R. Evid. 602 (stating that a witness may only testify to a matter if he has "personal knowledge of the matter").  The contents of the declarations cannot be mischaracterized into hearsay for exclusion purposes.  Accordingly, the declarations of Chickola, Hoffman, and Turtora will not be excluded.

### B.   *Manufacturer Service Bulletins and Projectile Maps*

Plaintiffs also move to exclude the Service Bulletins issued by Bolliger & Mabillard as inadmissible hearsay.  However, by definition, hearsay is an out-of-court statement "offer[ed] in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c)(2).  Implicit in this definition is that a statement not offered for the truth of that statement is not inadmissible hearsay. Here, Defendants are introducing the Service Bulletins not for the truth of the matter asserted within the documents, but rather to show that Six Flags received the Service Bulletins and implemented them in an attempt to follow New Jersey law.  Accordingly, because the Service Bulletins are not being used for the truth of the matter asserted within the documents, the Service Bulletins do not constitute hearsay.

Defendants also seek to exclude the Service Bulletins and the Projectile Maps created by Six Flags' internal engineering team on the grounds that each violates the standard set forth in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  This argument is misplaced for both sets of documents.  As just discussed, the Service Bulletins are not being introduced as expert evidence, and therefore the *Daubert* standard for expert evidence does not apply.  Six Flags is not seeking to introduce the statement contained within the Service Bulletins as "scientific" fact or opinion, but rather are using the Service Bulletins to show that Six Flags

received said guidelines and implemented the requirements mandated by the ride manufacturers.

Likewise, Six Flags is not seeking to use the Projectile Maps as expert evidence.  It is an internal

business record created by Six Flags' engineering team to assist in Six Flags' audit of its ride

safety requirements.  As used by Six Flags in the current motion, the Projectile Maps are meant

to show the work performed by Six Flags' engineering team and the observations of the

engineering staff conducting the analysis.  The Projectile Maps are meant to establish what steps

Six Flags took in conducting the internal audit.  Contrary to Plaintiffs' assertions, these

documents are not being used as "expert opinions on mechanical and theoretical physics and the

biomechanical safety components of amusement park rides in relation to people with

disabilities."  Pls.' Cross-Mot. At 16.  Similar to the Service Bulletins, when such documents are

not being used to prove or otherwise show scientific or technical opinions, but rather are meant

to show simply that Six Flags conducted such an analysis, the standard establish in *Daubert* does

not apply.  Accordingly, because the Service Bulletins and Projectile Maps are not being used in

this motion for impermissible hearsay purposes or as expert opinions, Plaintiffs' motion to

exclude such evidence from consideration is denied.

### C.    *The Incident at Darien Lake*

Finally, Plaintiffs argue that any evidence relating to the Darien Lake accident should be

excluded from consideration under Rule 403 balancing concerns and as hearsay.  Under Fed. R.

Evid. 403, a district court should exclude evidence "if 'its probative value is substantially

outweighed by the danger of unfair prejudice.'"  *United States v. Vosburgh*, 602 F.3d 512, 537

(3d Cir. 2010) (quoting *United States v. Jones*, 566 F.3d 353, 362 (3d Cir. 2009)).  The Court,

however, does not believe that Six Flags is using the incident at Darien Lake in its current

motion in any prejudicial way—rather, the Darien Lake incident is mentioned in certain

submitted declarations to establish a timeline of its own internal audit of its ride safety requirements.  In this capacity, the mention of the Darien Lake accident in no way prejudices Plaintiffs.  The Court can appropriately weigh the probative value of the Darien Lake incident to this action.[5]  Further, Six Flags' mention of the Darien Lake does not constitute hearsay under Rule 801(c).  The incident is referenced only in the declarations of Patrick Hoffman and Leonard Turtora.  Both Hoffman and Turtora explain their own understanding of the accident and how it was the impetus for the Service Bulletins and Six Flags' internal safety audit.  *See, e.g.*, Turtora Decl. ¶¶ 6–7.  Such a use does not constitute impermissible hearsay, because the discussion of the accident at Darien Lake is not being offered for the truth of the matter asserted.  *See* Fed. R. Evid. 801(c)(2).  Accordingly, the Court denies Plaintiffs' motion to exclude any reference to the Darien Lake incident from consideration during the summary judgment motion.  The Court now turns to the merits of the summary judgment motions.

## III.   Standard of Review

### A.   *Local Civil Rule 56.1*

As an initial matter, the Court notes that Plaintiffs' Motion for Summary Judgment and Opposition to Defendant's Motion for Summary Judgment are procedurally deficient.  Under Local Civil Rule 56.1, a party moving for summary judgment "shall furnish a statement which sets forth material facts as to which there does not exist a genuine issue, in separately numbered paragraphs citing to the affidavits and other documents submitted in support of the motion."  L. Civ. R. 56.1(a).  As noted in the Rule's commentary, "the requirement of a separate document represents a change from the practice under the former version of the rule [and] . . . is viewed by the Court as a vital procedural step, since it constitutes and is relied upon as a critical admission

---

[5] If this matter should go to trial, Plaintiffs are, once again, free to move the Court to limit the use of such evidence at a more relevant time.

of the parties." L. Civ. R. 56.1 cmt. The commentary specifies that the assertions in each statement must be set out in separately numbered paragraphs, and each fact alleged must be supported by a specific citation to an affidavit. *See* L. Civ. R. 56.1 cmt. The failure to comply with Rule 56.1(a) can be severe—"[a] motion for summary judgment unaccompanied by a statement of material facts not in dispute shall be dismissed." L. Civ. R. 56.1(a).

Here, while Plaintiffs have provided a document entitled "Statement of Material Facts in Support of its Cross Motion for Summary Judgment," the vast majority of statements are not supported by any sort of citations or documentation to which the Court could verify its accuracy. Further, Plaintiffs appear to make their statement into a certification/declaration of Plaintiff Joanna Lynn Masci and non-party Robert Masci. To the extent that Plaintiffs attempt to transform their Statement into such a certification/declaration of the Mascis, such an attempt will be ignored by this Court, as the statement lacks a number of key requirements for a certification or a declaration of a fact witness. Likewise, the few documents that Plaintiffs have attached to their brief are either unauthenticated, uncorroborated, undated, or otherwise lacking in information such that this Court cannot and will not simply take them at face value. Overall, other than the title of the document itself, Plaintiff's Statement in no way complies with Local Rule 56.1. Not only does this leave Defendant in a position where it is unable to counter or verify any of the statements asserted by Plaintiffs, but the Court itself is largely unable to assess the strength of Plaintiff's arguments or to determine whether there are any material factual disputes. Therefore, the Court finds that, in the interest of justice, this failure to comply with the Local Civil Rules by itself suffices to deny Plaintiffs' motion for summary judgment.[6]

---

[6] Further, as discussed in great detail below, the lack of evidence regarding Joseph's ability to meet the ridership requirements, as well as if Joseph was "tested" to see if he met the requirements, also works to prevent the Court from entering summary judgment on either party's behalf.

### B.      *Summary Judgment Standard*

Federal Rule of Civil Procedure 56(a) provides that "a court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The substantive law identifies which facts are material. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact raises a "genuine" issue "if the evidence is such that a reasonable jury could return a verdict" for the non-moving party. *Healy v. N.Y. Life Ins. Co.*, 860 F.2d 1209, 1219 n.3 (3d Cir. 1988).

The Court must consider all facts and their logical inferences in the light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). The Court shall not "weigh the evidence and determine the truth of the matter," but need determine only whether a genuine issue necessitates a trial. *Anderson*, 477 U.S. at 249. While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 250. If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be no genuine issue of material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 n.5 (3d Cir. 1992) (quotation omitted). If the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine issue of material fact exists, then the

Court must grant summary judgment.  *Big Apple BMW v. BMW of N. Am.*, 974 F.2d 1358, 1363 (3d Cir. 1992).

## IV.     Discussion

As discussed, Plaintiffs have asserted violations of both the ADA and the NJLAD. Because the protections provided to disabled persons under the NJLAD are analogous to the protections offered under the ADA, "New Jersey courts therefore apply the standards developed under the ADA when analyzing NJLAD claims."  *Mucci v. Rutgers*, No. 08-4806, 2011 U.S. Dist. LEXIS 21580, at *63 (D.N.J. Mar. 3, 2011) (citing *Jones v. Aluminum Shapes*, 772 A.2d 34, 40–44 (N.J. Sup. Ct. App. Div. 2001)); *see also Hibbert v. Bellmawr Park Mut. Hous. Corp.*, 937 F. Supp. 2d 565, 574 (D.N.J. 2013) (explaining that the Third Circuit recognizes that New Jersey courts, when construing NJLAD claims, typically look to federal anti-discrimination laws for guidance, particularly the ADA).  Accordingly, the Court will apply the same standards to Plaintiffs' ADA and NJLAD claims, and differentiate only when necessary.

While Plaintiffs' Complaint is vague about the basis for their claim, stating only that the "refusal of the defendant to allow [Joseph] to utilize said rides is a violation of the [NJLAD] and the federal [ADA]," it can be assumed that Plaintiffs' ADA claim is brought pursuant to Title III of the ADA.  Title III of the ADA provides, in relevant part: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).  To the best of the Court's interpretation,[7] Plaintiffs' ADA claim appears to proceed under two theories of discrimination:  that Six Flags excluded

---

[7] As discussed in greater length below, Plaintiffs' theory of the case is hard to interpret from its briefing.  If Plaintiffs intended to advance another theory of discrimination, it is free to do so at a later stage if necessary.

him based on certain improper eligibility criteria for its rides, and that Six Flags failed to correctly enforce its own policies. These theories stem from § 12182(b)(2)(A)(i),[8] which provides that discrimination includes:

> the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability . . . from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations being offered . . . .

42 U.S.C. § 12182(b)(2)(A)(i).

Here, there is no dispute that Six Flags qualifies as a "place of public accommodation," *see* 42 U.S.C. §§ 12181(7)(I), and that Joseph is a qualified disabled person under the ADA. The parties also do not dispute that Six Flags' ridership requirements discriminate on their face by excluding certain disabled riders. Six Flags, however, has asserted two defenses, through which it argues it is entitled to summary judgment. First, that it was required by New Jersey law, pursuant to N.J. Admin. Code § 5:14A-9.8(a), to follow the ridership requirements implemented by its ride manufacturers, and second, that the requirements do not otherwise violate the ADA because the ridership requirements are necessary for the safe operation of the ride. The Court considers these arguments together.

Under the ADA, there are two safety "defenses" to policies or criteria that are otherwise discriminatory. First, the language of the improper criteria theory specifies that eligibility criteria that otherwise screens out a disabled individual is not discriminatory if "such criteria can be shown to be necessary for the provision of the . . . accommodations being offered." 42 U.S.C. § 12182(B)(2(A)(i). The Department of Justice (DOJ), however, recognizing that certain goods and services may require the exclusion of disabled persons due to safety concerns, promulgated

---

[8] While the improper enforcement claim does not clearly track any statutory language, the Court assumes, without deciding, that it fits under § 12182(b)(2)(A)(i), as it deals with the application of the eligibility criteria.

28 C.F.R. § 36.301, which provides that "[a] public accommodation may impose legitimate safety requirements that are necessary for safe operation. Safety requirements must be based on actual risks and not on mere speculation, stereotypes, or generalizations about individuals with disabilities." 28 C.F.R. § 36.301. Examples of justifiable safety qualifications, as provided by the DOJ, "include height requirements for certain amusement park rides or a requirement that all participants in a recreational rafting expedition be able to meet a necessary level of swimming proficiency." 56 Fed. Reg. 35544-01. Once again, these safety requirements "must be based on actual risks and not on speculation, stereotypes, or generalizations about individuals with disabilities." *Id.*

The second safety defense concentrates on the safety of others. The ADA specifically allows an entity to exclude an individual from participating in or accessing its services or facilities when "such individual poses a direct threat to the health or safety of others." 42 U.S.C. § 12182 (b)(3). The statute defines a "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by a modification of policies, practices, or procedures or by the provision of auxiliary aids or services." *Id.* The regulations make clear that a public accommodation may not simply speculate as to the existence of a direct threat by an individual; rather, it

> must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: The nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk.

28 C.F.R. § 36.208(b).

Six Flags argues that it was required under New Jersey law to implement the ridership requirements mandated by its ride manufacturers, and therefore it cannot be liable under the

ADA.  Six Flags, however, has only provided evidence that the manufacturer, Bolliger &

Mabillard, had changed the ridership requirements for five of its high-thrill rides.  According to

the briefs supplied by both sides, however, Plaintiff was not allowed to ride the majority of the

rides at Great Adventure.  For all the other rides at Six Flags that Joseph was not allowed to ride,

this argument is unsupported by evidence and therefore inapplicable.

      The Court, however, does believe that this proof of ridership requirements mandated by

the manufacturer for those few rides can be relied upon by Six Flags as proof of a legitimate

safety requirement under the ADA.  As discussed, an entity is allowed to "impose legitimate

safety requirements that are necessary for safe operation."  28 C.F.R. § 36.301(b).  While

Plaintiffs attempt to create a factual issue by arguing that Defendant has failed to show that the

ridership requirements are indeed necessary, the Court believes that Six Flags can reasonably

rely upon the ridership restrictions created by the ride experts—the manufacturers.  It is only

logical that the ride manufacturers, as the manufacturer of the ride, are in the best position to

determine what ridership requirements are warranted and necessary to make the ride safe for all

guests.  As a sister court in California explained in a case containing nearly identical facts and a

similar California law:

> The Court is unwilling to require Defendants to second-guess the manufacturer's
> safety requirements. California law requires enforcement of the manufacturer's
> safety requirements, and the manufacturer has directed that riders must have at least
> one functioning arm and hand, and at least one leg and foot. It is not Defendants'
> responsibility to challenge the manufacturer's operating manual, and ensure these
> requirements are in fact necessary for the safe operation of [the ride].  If Plaintiffs
> believe the restrictions are overprotective, they are free to initiate an action against
> the manufacturer.  For the purposes of this motion, however, the Court is satisfied
> that California law effectively requires Defendants to enforce the eligibility criteria
> of which Plaintiffs now complain.

*Castelan v. Universal Studios Inc.*, CV 12-05481 BRO, 2014 U.S. Dist. LEXIS 9092, at *20-21

(C.D. Cal. Jan. 10, 2014).  Likewise, the Court does not believe that the ADA places additional

requirements on Six Flags to reevaluate the ridership requirements to find out if they are, in fact, necessary.  Rather, the ridership requirements of the manufacturer establish certain safety requirements that have been found necessary for the safe operation of the rides.  New Jersey law requires Six Flags to follow and implement the ridership safety requirements of the manufacturer, an indication of its belief that the manufacturer should be responsible for determining what constitutes a necessary safety measure.[9]  If these requirements work to exclude Joseph from certain rides due to his disability, Six Flags has satisfied their burden in demonstrating that such exclusion from the rides it has provided the service bulletins for does not violate the ADA.  *See Castelan*, 2014 U.S. Dist. LEXIS 9092, at *22.

The Court finds, however, that Six Flags has failed to meet its burden in establishing that the ridership requirements it has imposed for the (vast) majority of the rides at Great Adventure are a legitimate safety requirement.  Six Flags has provided evidence establishing that it conducted an audit of the ridership requirements of its rides.  At the conclusion of this audit, it changed its ridership requirement as follows:  (1) where the manufacturer had issued recent service bulletins, Six Flags would impose those restrictions, and (2) where the manufacturer was no longer in business or had not issued recent guidelines, Six Flags would impose a ridership requirement in which a guest must possess at least one fully formed and functioning leg extremity absent a prosthetic device and one fully formed and functioning arm extremity without a prosthetic device.  Defendant has submitted declarations that state it reached this conclusion after an executive committee considered the manufacturing guidelines and service bulletins for

---

[9] In its moving brief, Plaintiffs state, "Finally, under the Supremacy Flags cannot blindly rely on state law contrary to the ADA," and proceed to quote over three pages of law on preemption.  *See* Pls.' Br. at 20–23.  The Court notes that, like many of its other arguments, Plaintiffs have failed to provide any application of this law to the current matter.  Because, however, the Court finds that there is no conflict between the ADA and the New Jersey law, it will not address the preemption argument.

the rides, the standards developed by ASTM, reports from Six Flags' engineering team, and the collective knowledge of the committee members.  Other than merely stating that Six Flags reviewed such evidence when changing its ridership requirements, Defendants have failed to provide any evidence supporting why these ridership requirements were established.  These standards created by Six Flags—that apply to apparently every ride except an extremely small minority—have not been established or shown to be *necessary* for the safe operation of each ride.  It certainly fails to establish what "actual risk" the safety requirements are based on.  *See* 28 C.F.R. § 36.301.  Indeed, such a blanket approach to ridership requirements of rides with varying levels of risk (from "mild" to "high thrill") certainly insinuates the imposition of such requirements was based on "mere speculation, stereotypes, or generalizations about individuals with disabilities" rather than actual risk.  *Id.* In a similar case involving Six Flags in a federal district court in Texas, the court noted that Six Flags' evidence showed, at best, that "they bluntly compared a wide class of rides and imposed uniform requirements.  That broad approach is commendable in terms of cost.  But it also leaves [the plaintiff] without an answer as to why his disability from safely riding roller coasters, and it does not satisfy the ADA's requirements." *Bench v. Six Flags Over Texas, Inc.*, No. 13-cv-705, slip op. at 17 (N.D. Tex. July 3, 2014).  The Court agrees here.  Six Flags' evidence requires the Court to blindly trust Six Flags instead of actually requiring Six Flags to prove that the ridership requirements were indeed necessary.  Six Flags, however, has the burden of establishing that its ridership requirements that worked to exclude Joseph from the majority of its rides were for legitimate safety reasons, as opposed to Joseph's status as a disabled individual.  When a disabled individual is singled out and discriminated on the very basis of his disability, the Court must necessarily wary of simply

trusting Six Flags. While Six Flags may very well be able to easily prove that such ridership requirements are necessary,[10] it has failed to sufficiently do so.

Six Flags has also asserted that it had implemented certain ridership requirements for the safety of others, because allowing individuals with prosthetic devices on rides created a direct threat to the safety of others. *See* 42 U.S.C. § 12182(b)(3). Specifically, Six Flags' engineering team conducted an analysis regarding prosthetic limbs and the potential that such limbs could become projectiles if allowed on certain rides, and based, in part, on this analysis, Six Flags decided to bar the use of prosthetics on the vast majority of its rides at Great Adventure. Plaintiffs, however, appear to base their objection to Six Flags' ridership requirements on Six Flags' refusal to allow Joseph to ride certain rides *without* the use of his prosthetics. Accordingly, the Court does not believe that the direct threat defense is applicable here. If, however, Plaintiffs are arguing that Joseph should have been able to ride certain rides wearing his prosthetics, the Court will allow Defendants to raise this defense at that point.[11]

Finally, Defendant's summary judgment motion (as well as Plaintiffs' summary judgment motion) must be denied because there are, quite simply, material factual disputes regarding the decision to exclude Joseph from the rides at Great Adventure—or, perhaps more specifically, there are too many factual deficiencies regarding the decision to exclude Joseph

---

[10] The Court notes that Mr. John Paul Scott, Defendant's proposed expert, only discusses in his report and declaration that an amusement park may appropriately enact policies that are "necessary for the safe operation" of the rides. He never discusses if Six Flags' ridership requirements are *actually* necessary for legitimate safety reasons. His report is also confined to high thrill rides at Six Flags.

[11] Under the "direct threat" defense, Six Flags would have to show that they conducted an "individualized assessment" of each ride to ascertain the risk of using prosthetics on the ride. In its current motion, Chickola, the Chief Engineer, has testified that he and his team conducted an analysis of several rides to see the risk of using prosthetics on those rides. In conducting this analysis, he explains that he and his team prepared a number of maps detailing potential projectile paths a prosthetic limb could take. These maps are attached as an exhibit, and show that these projectile maps were drawn for sixteen rides at Six Flags. As noted by Mr. Chickola, Six Flags then made the decision to bar the use of prosthetics on the "vast majority" of rides at Great Adventure. *See* Chicola Decl. ¶ 14. Accordingly, it is unclear if an individual assessment was actually done for each ride that prosthetics are barred on based on the evidence before the Court.

from the rides.  Even assuming that Six Flags' ridership requirements are appropriate under the

ADA, it remains unclear if Joseph nevertheless qualified for the rides pursuant to the ridership

requirements.  From the record in front of it, the Court gathers that the real issue is whether

Joseph had a functioning arm to qualify under the ridership requirements for the vast majority of

the rides.  Under the Safety Guide, an individual has a functioning arm if he has a "full arm with

the ability to be flexed at the elbow and a minimum of three full fingers with the ability to hold

on with a firm grip."  An individual can "hold on" if they can "use one's arms to maintain a

grasp on an assist bar and support one's body during normal and emergency procedures on a

ride. . . ."  *See* Safety Guide at 6.  It is disputed by the parties the extent of Joseph's limb

functionality, and the record in front of the Court leaves it unclear as to if Joseph had a

"functional" arm under Six Flags' standards.  The medical report submitted by Defendant only

describes Joseph's ability to pinch – it does not mention if, or the extent to which, Joseph can

grip with his left hand.  *See* Medical Rep. at 2.

Further, while the Court makes no determination at this time regarding whether or not Six

Flags has to make an "individualized assessment" of each rider who does not meet the ridership

requirements to discover if the guest might otherwise be able to (safely) ride the relevant ride,[12]

---

[12] The Court does not believe that this argument is properly before it.  Defendant has interpreted Plaintiffs'
arguments in their moving brief as suggesting that Six Flags has a requirement to make such an "individualized
assessment" of the capabilities of each rider who otherwise does not meet the ridership requirements.  *See* Def.'s
Opp. at 14.  The Court does not believe that Plaintiffs are making such a broad argument, but rather are arguing that
Six Flags should have otherwise conducted an assessment to see if he met the ridership requirements, not to see if he
could ride *despite* not having met these requirements.  After all, in Plaintiffs' brief, they state that "the failure to
make an individualized assessment is material in that [Joseph] has functional legs and can grip with his hand."  Pls.'
Br. at 24.  This appears to mean that Joseph could have met the ridership requirements if someone had assessed his
functionality.  *See also* Pls.' Reply Br. at 15 (stating that if an individualized assessment of Joseph had been done,
"Six Flags would have realized that Joseph Masci meets the safety qualifications for most of the rides at the park
even according to Six Flags' own Safety & Accessibility Guide").  The Court, however, understands Defendant's
confusion.  Plaintiffs' briefs are frustratingly vague and unclear about what Plaintiffs are arguing.  For example,
Plaintiffs argue that an "individualized assessment" should have been done of Joseph in order to establish he could
safely ride such rides, but they include this argument in a section about direct safety threats to others.  The majority
of Plaintiffs' brief points contain only legal standards, and no analysis or application to the current matter.  It leaves
the Court, and apparently Defendant, guessing at what Plaintiffs are arguing and how it applies.  If Plaintiffs did

the Court does agree with Plaintiffs that an "individualized assessment" (to use Plaintiffs'
expression) must be made concerning whether a guest actually meets the safety requirements of a
ride.  In other words, Six Flags should have an employee on hand (assumedly the ride operator)
who can determine or otherwise assess if a guest meets the ridership requirements for the ride in
question.  Indeed, "[i]mplicit in that right [to create eligibility criteria] is the right to ask if an
individual meets the criteria."  28 C.F.R. § Pt. 36, App. C (guidance on 28 C.F.R. § 36.208).  Six
Flags itself appears to recognize its obligation to ascertain if an individual meets the ridership
requirements, as the Safety Guide includes certain standards that must be met in order for a guest
to meet its definition of having a functioning extremity.  The existence of such standards imply
that an employee at Great Adventure must make a determination of whether a guest qualifies as
meeting the standards or not.  *See, e.g.*, Safety Guide at 6 (explaining what must be shown to
qualify as having the "ability to hold on or brace" under the ridership requirements).  It is unclear
from the record if Joseph was "tested" to see if he met the safety requirements of the various
rides.  On the basis of Plaintiffs' briefs, however, there appears to be a possibility that Six Flags
prevented Joseph from riding its rides based on the *appearance* of his disability rather than based
on his actual failure to meet the ridership requirements set forth in the Safety Guide.  If Six Flags
was discriminating against Joseph based on the appearance of his disability rather than any
legitimate safety concerns, Defendant's safety defenses would appear to be irrelevant.
Accordingly, the issue of whether or not Joseph has the ability to grip—and whether or not Six
Flags made a determination regarding said ability of Joseph—further prevents this Court from

---

intend to argue that Six Flags has an obligation to provide an individual assessment of those who do not meet the
safety requirements to see if they may otherwise ride, or to otherwise modify the services Six Flags offers, it may
make such an argument at a later date in a way that is clear to both the Court and Defendant.  The Court notes in
advance that it finds it informative that the DOJ has indicated its belief "that the ADA clearly requires that any
determination to exclude an individual from participation must be based on an objective standard," and not a
subjective one.  *See* Guidance on ADA Regulation on Nondiscrimination on the Basis of Disability by Public
Accommodations and in Commercial Facilities, 28 C.F.R. § Pt. 36, App. C (guidance on 28 C.F.R. § 36.208).

entering summary judgment in favor of Defendant (or even Plaintiffs).   Therefore, the Court is compelled to deny Defendant's motion for summary judgment.

**V.       Conclusion**

For the foregoing reasons, Defendant Six Flags' Motion for Summary Judgment is denied.  Plaintiffs' Motion for Summary Judgment, and Cross-Motion to Exclude Evidence, are also denied.  An appropriate Order accompanies this Opinion.

/s/ Joel A. Pisano
JOEL A. PISANO, U.S.D.J.

Dated: December 31, 2014